ROBERTSON, Presiding Judge.
Willy Sherman Brumett appeals from a summary judgment entered by the Circuit Court of Autauga County in favor of Everywhere Trucking Company, Inc. (“ETC”), on his claim seeking workers’ compensation benefits. We reverse and remand.
Brumett filed his complaint in the Circuit Court of Etowah County on July 18, 1997, seeking compensation for injuries he sustained to his neck and back while working in the line and scope of his employment at ETC. On October 21, 1997, ETC filed a “Motion to Change Venue,” which was granted by the trial court; the case was transferred to the Autauga County Circuit Court on November 24,1997.
On May 26, 1998, ETC moved for a summary judgment. Brumett filed a response in opposition to ETC’s summary-judgment motion on July 6, 1998. ETC filed a motion to strike two exhibits offered by Brumett in opposition to its summary-judgment motion; the trial court held that the exhibits were hearsay and struck them from the record. On July 27, 1998, the trial court entered a summary judgment in favor of ETC, with the following order:
“1.... [Tjhere is no genuine issue ... as to the following [material] facts:
“A. That [Brumett] received a job-related injury while employed by [ETC].
“B. That [Brumett] gave timely and adequate notice of the injury.
“C. That [ETC] has provided [workers’] compensation medical benefits to [Brumett].
“D. That the treating physicians have released [Brumett] to go back to his employment.
“E. That Dr. Miller has assigned [Brumett] a 0% vocational rating and no loss of earning capacity.
“F. That Dr. Ryan assigned a 0% permanent partial impairment rating.
“... [ETC] is entitled to a Summary Judgment ..., there being no genuine issue of material fact [and ETC being] entitled to [a] judgment as a matter of law.”
Brumett filed a timely post-judgment motion and an amended post-judgment motion, which were denied on October 27, 1998.
Brumett appeals, arguing: (1) that the trial court erred by allowing ETC to file its motion to strike at the summary-judgment hearing without having given advance notice of the motion and then by failing to continue the summary-judgment hearing to allow him time to secure deposition testimony to satisfy the objection raised in ETC’s motion; and (2) that the trial court erred in entering the summary judgment in favor of ETC because, he says, the deposition testimony and medical records create genuine issues of material fact as to the extent of his disability.
*1088 In reviewing the disposition of a motion for a summary judgment, we use the same standard as the trial court used in determining “whether the evidence before [it] made out a genuine issue of material fact” and whether the movant was “entitled to a judgment as a matter of law.” Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988); Rule 56(c), Ala. R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990). The summary-judgment procedure is not a substitute for a trial on disputed issues of fact, and it cannot be used to deprive a litigant of a proper trial to resolve genuine issues of material fact. Duckett v. Wilson Hotel Mgmt. Co., 669 So.2d 977 (Ala.Civ.App.1995).
We find dispositive Brumett’s contention that he presented substantial evidence indicating that he is disabled as a result of his on-the-job injury.
The record, viewed in a light most favorable to Brumett, shows that he was a truck driver for ETC. Brumett testified by deposition that on September 2, 1996, he had stopped the 18-wheel truck he drove for ETC at a rest area in Tennessee and had rolled down the passenger-side window in an attempt to fix the rear-view mirror. He stated that the passenger door came open and that he fell out of the cab of the truck onto the ground. He testified that in the fall he hit the top step of the truck with his neck and the bottom step with his back, and that he landed on his lower back on the pavement. He stated that after he landed on the pavement, he got up, got back into the truck, and drove approximately four miles to a truck stop, also in Tennessee; he stated that during this drive, he began experiencing pain in his lower back and in his neck and down between his shoulder blades, and that during this drive the middle and ring fingers on his left hand went numb.
Brumett testified that he reported his injury to his dispatcher at ETC and that he then went to the emergency room. He stated that he had no means of transportation to the hospital and that he had to telephone for an ambulance to pick him up and take him there. He testified that on his way to the hospital he turned on the gurney and that when he did he had pain that felt “like [an] electrical shock running down the insides of [his] legs.” He also testified that at the emergency room X-rays were taken. He stated that the emergency room physician told him that a cervical collar was not available because of his great size and therefore he needed to see the company doctor as soon as possible, and that he did not need to drive home; he stated that his wife came and picked him up and brought him back to Alabama.
Brumett also testified that ETC sent him to Urgent Care, where he was again X-rayed; he stated that a cervical collar was put on him and that he was told to go to the hospital immediately because there was a good chance that he had broken his neck. Once there, he was X-rayed and referred to Dr. Bo White. He testified that Dr. White sent him for two MRIs and a' myelogram, but that those tests could not be performed on him because of his size and body weight. He also stated that Dr. White sent him for physical therapy, but that his symptoms did not improve. He testified that Dr. White also sent him for “work hardening,” but that he was only *1089 able to attend that program for a couple of days.[1] The record also indicates that Dr. White obtained a functional-capacity evaluation on Brumett and that he returned Brumett to light-duty work, after determining that Brumett had reached maximum medical improvement; then he referred Brumett to Dr. Daniel 0. Ryan, an orthopedic physician, for a second opinion.
Brumett testified that when he first saw Dr. Ryan, two X-rays were taken; he also testified that Dr. Ryan told him that there was nothing he could do for him. He testified that when he saw Dr. Ryan several months later, Dr. Ryan referred him to a pain clinic.
With regard to his physical condition, Brumett testified that he had been unable to drive a truck because of the “bouncing around” and movement of the truck and that he had been unable to sit for long periods. He stated that he was still experiencing pain in his neck and down between his shoulder blades, that the pain in his lower back was a “dull, hard pain,” and that his two fingers were still numb. He testified that he would rate his level of pain on a scale from 1 to 10, with 10 being the greatest, between 4 and 6. He also testified that after being released to return to work by Dr. Ryan, he had not attempted to work.
Dr. Ryan testified by deposition that he performed a physical examination on Bru-mett and found the following:
“He had pain in his shoulder and pain in his back centrally at the border of his scapula or shoulder blade. He did not have any shoulder joint pain. He did not have pain suggestive of a problem with the muscles that move the shoulder or the rotator cuff. He had some mild triceps weakness and giving way on testing strength. And the problem with giving way is that giving way is frequently a voluntary sign. It’s not always. His biceps reflex was slightly depressed. His triceps reflexes were slightly depressed, but they were symmetric side to side. And really what all this means is that it’s completely inconclusive. He could manufacture these symptoms. They could be real. They ... don’t stack up exactly with a C7 radiculopathy, but some of these findings are suggestive of a C7 radiculopa-thy. So at this point, it’s still confusing if you’re trying to decide exactly what’s wrong with Mr. Brumett. It’s impossible to say whether or not he had a problem with the cervical spine with absolute certainty.”
Dr. Ryan also testified that the nerve-conduction study, which had been ordered by Dr. White and had been performed on Brumett, indicated that Brumett does not appear to have anything wrong with his cervical spine area, but that it is slightly abnormal, indicating a possible compression of the ulnar nerve at the elbow. He further testified that he had obtained an X-ray of Brumett’s lumbar spine and that it appeared normal. Dr. Ryan testified that he could not find anything objectively wrong with Brumett. He also testified that there had never been an adequate MRI done on Brumett because of his size, and that he had attempted a CT myelo-gram on Brumett, but that Brumett did not tolerate it. He also stated that Bru-mett’s cervical symptoms and arm symptoms do not “stack up” with a classic C7 radiculopathy and that the nerve-conduction studies are suggestive of a peripheral nerve problem of which Brumett is not complaining of any symptoms. Dr. Ryan diagnosed Brumett with a classic lumbar strain, or muscle strain. He stated that the strain could possibly be related to Bru-mett’s fall from the truck, but that the condition is more likely “related to some activity [Brumett] had been performing and his excessive weight and body habi-tus.” He returned Brumett to work, without restrictions, on September 18, 1997, *1090 and he assigned Brumett a disability rating of zero percent.
Joseph M. Miller, a licensed professional counselor in Florida, testified by deposition that he had performed a functional-capacity evaluation on Brumett. He testified that Brumett had sustained a 64.28% loss of access to the labor market, based on the medical records of Dr. White and his own evaluation of Brumett. He testified that he did not feel that Brumett was unemployable. In the functional-capacity evaluation, he stated that “Brumett is able to work at the LIGHT Physical Demand Level for an 8 hour day,” restricting Bru-mett with a leg-lift capability of 30 pounds and a torso-lift capability of 20 pounds. He stated that there are “a whole lot of things why [Brumett] can’t do certain things,” but that these “things” are not related to Brumett’s falling out of the truck. He also stated in his functional-capacity evaluation that Brumett “exhibited symptom exaggeration behavior [and that he] passed only validity criteria during the functional capacity evaluation, 50%, which suggests voluntary submaximal effort.” Although he did not have Dr. Ryan’s medical records at the time of his evaluation, he was allowed to review Dr. Ryan’s medical records and deposition testimony; he subsequently changed his opinion, stating that Brumett did not suffer an impairment and had no loss of earning capacity.
We note that “[a]n injured employee’s own subjective complaints of pain are legal evidence which may support a finding of disability.” Jim Walter Resources v. Budnick, 619 So.2d 926 (Ala.Civ.App.1993). After carefully reviewing the record, we conclude that Brumett presented substantial evidence creating a genuine issue of material fact as to the extent of the disabil-' ity he sustained as a result of his fall from the cab of the truck. Therefore, the trial court erred in entering the summary judgment.
Because Brumett presented substantial evidence indicating that he suffered a disability as a result of his on-the-job injury, and thereby created a genuine issue of material fact, we need not address his other arguments.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
YATES and CRAWLEY, JJ., concur.
MONROE and THOMPSON, JJ., concur in the result.

. A work-hardening program is a physical-therapy program that simulates work activities and is a mechanism by which a physician can return a patient to work.