THOMPSON, Judge.
J.S., Jr., and J.S., Sr., appeal the Elmore Juvenile Court’s judgment awarding custody of Dy.T. and Da.T. (hereinafter “the children”) to S.C. and C.C.[1] We affirm.
The record reveals that the children, who are twin boys, were born on November 12, 2003. Approximately 8 months after the children were born, Che.T., the children’s mother, was arrested and charged with theft by deception for conspiring to sell the children to several prospective adoptive parents. The mother pleaded guilty in March 2005 to two counts of theft in the first degree and one count of theft in the second degree. Before her sentencing hearing, the mother left the children at the Adullam House in Wetump-ka to be cared for by A.S., the owner of the Adullam House, during the mother’s incarceration.
When the children were approximately 10 months old, S.C. and C.C. began to visit them once a week at the Adullam House at the encouragement of the mother. S.C. and C.C. first met the mother while she was still pregnant with the children. After the children turned a year old, S.C. and C.C. visited them several times a week, and they occasionally kept the children overnight.
On July 1, 2005, after the children had been in her custody for one year, A.S. filed a complaint in the Elmore Juvenile Court (hereinafter “the trial court”) alleging that the children were dependent and seeking custody of the children. On August 25, 2005, S.C. and C.C. filed a complaint in the trial court alleging that the children were dependent and seeking to terminate the parental rights of the mother and Chr.T., the children’s father. At the time S.C. and C.C. filed them complaint, the mother was incarcerated and the father had consented to relinquish his parental rights to the children and to the adoption of the children by S.C. and C.C. On March 6, 2006, S.C. and C.C. petitioned the trial court for custody of the children pending the outcome of their action seeking to terminate the mother’s and the father’s parental rights. On September 20, 2005, J.S., Jr., the children’s maternal uncle, and J.S., Sr., the children’s maternal grandfather, filed a complaint alleging that the children were dependent and seeking custody of the children.
Pursuant to an order of the trial court, home studies were conducted on J.S., Jr., and S.C. and C.C. On March 9, 2006, A.S. moved to intervene in the termination action filed by S.C. and C.C. and moved to amend her July 1, 2005, dependency complaint to include a request to terminate the mother’s and the father’s parental rights. *666 The trial court granted A.S.’s motion to intervene; it also granted an oral motion made by J.S., Jr., and J.S., Sr., to intervene in the termination proceedings immediately before the final hearing in that action.
Following an ore tenus hearing, the trial court entered a detailed order on April 10, 2006, finding the children to be dependent, terminating the mother’s and the father’s parental rights, and awarding permanent, legal custody of the children to S.C. and C.C. In that judgment, the trial court denied the petition for custody filed by J.S., Jr., and J.S., Sr. That judgment stated, in pertinent part, as follows:
“[C.C. and S.C.] were shopping at Wal-Mart [store] sometime in 2003 when they noticed and began talking to [the mother], who was pregnant and appeared to be very tired, and her mother. [The mother] revealed she was expecting twins, that the delivery date was near, and this day she was shopping in preparation of her marriage to [Chr. TJ, the father of the twins. She was excited about the wedding but advised she had two children already and was planning to place the new babies for adoption. [C.C. and S.C.] told her they had five children and were now praying about whether or not to adopt a child from another country. They exchanged telephone numbers. Later, [C.C. and S.C.] assisted [the mother] with transportation on a few occasions. Shortly after the birth of the twins, [Da.T. and Dy.T.], on November 12, 2003, [the mother] took the children to Florida and placed them with paternal relatives. [The mother] and her mother were charged [with] theft by deception in a scheme to place the twins for adoption for money with several couples. Prior to her conviction, [the mother] traveled to Florida to retrieve the twins and placed them at Adullam House. This is a home owned by [A.S.] for the purpose of caring for the children of inmates at Julia Tutwiler Prison. [The mother] wrote a letter to [A.S.] and requested that she take care of the [children].
“When the [children] arrived at Adul-lam House in 2004, they had no belongings or paperwork. Both boys appeared jaundiced, had distended bellies, and were highly strung. [A.S.] took [the children] to the Community Rural Health Clinic where all shots and immunizations were brought up to date, and they were tested for hepatitis. The [children] are now on target for their age development, are calm, healthier, and happier. Their speech development is delayed but progressing.
‘When [the mother] left the children at Adullam House, she advised [A.S.] she had nowhere else for them to go, that she just wanted to come and visit them. [A.S.] first met S.C. when she brought [the mother] to Adullam House to visit the children. [The mother’s] visits lasted ten to fifteen minutes each time. She became irritated with the [children] when they wouldn’t go to her because they didn’t know her. The visits were generally unpleasant. [The mother] entered a plea of guilt to theft by deception and was incarcerated in Julia Tutwiler Prison, where she is still serving her sentence. [A.S.] takes [the children] to visit her each month at the prison.
“... [A.S.] has received no money or supplies from [the mother], [the father], or any family member to this date, with the exception of a t-shirt and a pair of shorts from [J.S., Jr.,] and [J.S., Sr.,] after a previous court hearing in this matter. On one occasion, she recalled receiving a call from [J.S., Jr.,] who inquired about [the children], but that was quite some time ago.
*667 “[S.C.] took [the mother] to Adullam House on two occasions. Since that time, S.C., C.C., and their five children, ages two to fourteen, have become regular visitors at Adullam House. [A.S.] testified she encourages various individuals and families to develop a one on one relationship with each of the children at Adullam House, to make them feel special and give them additional attention. [A.S.] did not permit [C.C. and S.C.] to do this until she got to know them better, visited them in their home and knew they had been vetted by Agape Adoption Agency.
“[C.C. and S.C.] have developed a tremendous relationship with [the children]. The whole family attended their first birthday party. They ask if anything is needed and help with [the children]. They have taken them on regular outings and to their homes on five overnight visits. [C.C. and S.C.’s] children who are home schooled, love the [children], and play with them. When they come by Adullam House, both [children] run for their shoes and want to go with them. [C.C.] often stops in on the way to work and S.C. visits at least three times a week. [C.C. and S.C.] built a new room on to their home just for the [children], next to their own room.
“[The mother] discussed adoption with [C.C. and S.C.] when she called them collect from the county jail, [and] said she would agree to adoption if ... the father did. It was at this time that [the father] relinquished the children for adoption, but [the mother] changed her mind. [The mother] called them regularly from the jail. At no time did she make any reference to her father. S.C. met the mother’s father at a birthday party for [the mother’s] daughter ... in 2004.
“[S.C.] is a homemaker and home schools her children. She loves [the children] and wants them to become a part of the family. [C.C.] is a self-employed tree surgeon who schedules his work around his children so as to be present at their baseball and soccer games and other activities. He loves [the children] and wants to be a father to them. [C.C. and S.C.] have been married for over sixteen years.
“[J.S., Jr.], a half-brother to [the mother] (they have the same father), and [J.S., Sr.], her father, testified they were advised by [the mother] when she removed [the children] from Florida that they could not visit the children. They stated they were unaware where the children had been placed. They filed a petition for custody at [the mother’s] request. When [the children] lived in Florida, they saw them from time to time.
“[J.S., Jr.], is the primary petitioner. He is single and does not have any children. His father lives with him. Although aware of [the mother’s] legal problems and incarceration, neither [J.S., Jr., or J.S., Sr.,] made any effort to seek custody of the [mother’s] older children .... They are aware those two children had been placed in the custody of their step-grandfather, [the mother’s] mother’s husband, who subsequently moved to Florida and apparently lost his job and home. Approximately two months prior to this hearing, those children were placed in the custody of [the mother’s] half-brother (a stepson of [J.S., Sr.]) in Florida approximately forty-five minutes from where [J.S., Jr., and J.S., Sr.,] live. Both [J.S., Jr., and J.S., Sr.,] stated they were not interested in obtaining custody of those two children because they were pursuing custody of the children. They acknowledged they had had no contact with [the *668 children] since [the children] left Florida, and had not provided for them materially or otherwise. Although they stated they didn’t know where [the children] were placed, [J.S., Sr.], acknowledged he attended [the] birthday party where he saw [the children] in 2004.”
The trial court explained its decision to award S.C. and C.C. custody of the children and to deny the petition filed by J.S., Jr., and J.S., Sr., stating:
“[J.S., Jr., and J.S., Sr.], have shown no interest in these children. In the Affidavit accompanying their petition [J.S., Jr.,] stated:
“T would like custody in order to keep the children in our large family. [The mother] has expressed a desire to raise them when she gets on her feet. As a family we support her in this and until that time I am able to care for them. I have made inquiries in the past.’
“Prior to filing their petition, [J.S., Jr., and J.S., Sr.,] showed absolutely no interest in [the children]. Since filing the petition they have visited the children very briefly after prior hearings in this matter and then only because advised to do so by their attorney. They have not otherwise provided for them. One of the exhibits admitted into the record is [a] list of income and expenses [of J.S., Jr.]. Once normal household expenses are taken care of, [J.S., Jr.,] has a scant amount remaining to take care of two growing toddlers. His father recently retired from the Florida Department of Corrections, resides with him, but there was no evidence presented regarding his income or how he would help with the [children]. Their plan is to place [the children] in daycare, with financial assistance from the State of Florida. Their concern for the children is lukewarm at best. The Court is not convinced that placement with [J.S., Jr., and J.S., Sr.,] even though they are relatives, is in the best interest of the children.
“[C.C. and S.C.] have gone above and beyond the call of duty to show their loving care and concern for these children, by visiting them on a regular basis, providing for their material needs as necessary, taking them on visits to their home, providing them with a new room in their home, and including them in their own lives, and the lives of their five children.”
J.S., Jr., and J.S., Sr., timely appealed. The parents did not appeal the termination of their parental rights.
On appeal, J.S., Jr., and J.S., Sr., do not challenge the trial court’s finding of dependency but, instead, contend that the trial court abused its discretion by awarding custody of the children to S.C. and C.C. when two members of the children’s family were willing and able to take custody of the children. J.S., Jr., and J.S., Sr., specifically argue that, although the findings of the trial court regarding S.C. and C.C.’s involvement with the children are supported by the evidence, those findings are insufficient, as a matter of law, to overcome the statutory preference found in § 12-15-1.1(1) and (8), Ala.Code 1975, “[t]o preserve and strengthen the child’s family whenever possible” while maintaining “a preference at all times for the preservation of the family.”
J.S., Jr., and J.S., Sr., rely exclusively on Ex parte W.T.M., 851 So.2d 55 (Ala.Civ.App.2002), a plurality opinion, in support of their argument on appeal. In W.T.M., the trial court found the child dependent and placed the child in the protective custody of the Department of Human Resources (“DHR”); the child was then placed in foster care. W.T.M., the child’s father, and S.B., the father’s sister, jointly petitioned for custody of the child. Following a hearing, the trial court left the *669 child in the custody of DHR. Nine months later, V.T., the father’s sister, and E.T., her husband, intervened in the action and petitioned for custody of the child. Shortly thereafter, S.P., the child’s foster mother, also intervened in the action, seeking custody of the child. The trial court subsequently entered an order awarding custody of the child to “ “her Foster Parent [S.P.], with whom [DHR] placed said minor child approximately 2½ years ago.” ’ ” W.T.M., 851 So.2d at 57.
The father and E.T. and V.T. appealed the judgment of the trial court. On appeal, this court, in a plurality opinion, held that the trial court had erred by determining that it was in the child’s best interest to be placed in the custody of her foster mother. 851 So.2d at 58. In so holding, this court relied, in part, on § 12-15-1.1, AIa.Code 1975, and stated
“[t]he evidence demonstrates that V.T. and E.T., the father’s sister and brother-in-law, are willing and able to assume physical custody of the child, that the child has developed a relationship with them, and that they are fit and loving caregivers. The undisputed evidence indicates that the father has had a relationship with the child since her birth and that, but for the father’s debilitating stroke and the resulting physical limitations, he would himself be petitioning for custody of the child. Given the father’s limitations, awarding custody of the child to the paternal aunt and uncle is the nearest approximation to a real parent-child relationship possible for W.T.M. and [the child]. The mere fact that the child has been in S.P.’s foster care for a long time is insufficient, as a matter of law, to prevail over the policies and preferences that support placing the child with her relatives.”
W.T.M., 851 So.2d at 60.
J.S., Jr., and J.S., Sr., acknowledge on appeal that this case is distinguishable from W.T.M. insofar as the instant case does not involve the children’s placement in the custody of DHR or the foster-care system. However, this case is distinguishable from W.T.M. in additional ways not acknowledged by J.S., Jr., and J.S., Sr., on appeal.
The evidence presented to the trial court in the instant case revealed that J.S., Jr., and J.S., Sr., had minimal contact with the children before filing their petition for custody of the children. A.S., who had cared for the children since they were eight months old, testified that J.S., Jr., and J.S., Sr., had had no contact with 'the children before filing their petition on September 20, 2005. The record indicates that J.S., Sr., learned that the children had been placed at the Adullam House as early as March 2004, when he attended a birthday party at which the children were present. J.S., Jr., testified that he only learned that the children were at the Adul-lam House in March 2005. However, testimony revealed that J.S., Jr., had called the Adullam house approximately one year before he filed the September 2005 petition for custody to inquire about the children. A.S. testified that, during her telephone conversation with J.S., Jr., he did not ask for or assert any rights to the children.
A.S. testified that she never received any financial assistance from J.S., Jr., or J.S., Sr., and that they did not contact the children on their birthday or at Christmas. A.S. testified that J.S., Jr., and J.S., Sr., had not contacted her to check on the children after filing the September 2005 petition.
J.S., Jr., testified that he visited the children periodically after they were born. J.S., Jr., admitted that he had not had much contact with the children, and he *670 admitted that he saw the children for the first time when they arrived for a court hearing. J.S., Jr., testified that he filed his petition for custody after he learned that S.C. and C.C. had petitioned for custody and that they could possibly be awarded custody of the children. On cross-examination, J.S., Jr., testified that he would prefer that the children remain at the Adullam House rather than live with S.C. and C.C. J.S., Jr., stated that he petitioned for custody of the children because “[the children] are my family.”
J.S., Jr., testified that he would be the primary caregiver for the children should he receive custody of the children. J.S., Jr., is not married, and he was 27 years old at the time of the final hearing in this matter. He admitted that he had little experience with toddlers, but he stated that he had recently taken a parenting course in preparation for taking custody of the children. J.S., Jr., testified that he had moved into a four-bedroom, two-bathroom home with his father, J.S., Sr., in anticipation of gaining custody of the children. J.S., Jr., testified that he shared the household expenses with J.S., Sr. J.S., Jr., stated that he was financially capable of taking care of the children. However, on cross-examination, J.S., Jr., admitted that he would not have enough financial resources to care for the children without the financial assistance of J.S., Sr.
J.S., Sr., who was 63 years old at the time of the final hearing in this matter, testified that he had learned that S.C. and C.C. had filed a petition for custody of the children from the mother. J.S., Sr., testified that he wanted custody of the children because he felt that the children needed to grow up in their own family. J.S., Sr., admitted that he had only visited the children twice between March 2004 and March 2006, but he explained that he did not know that he could visit the children before he filed his September 2005 petition for custody.
Unlike V.T. and E.T. in W.T.M., there is no evidence indicating that J.S., Jr., or J.S., Sr., have developed a relationship with the children. In fact, J.S., Jr., and J.S., Sr., have only visited the children twice since filing their September 2005 petition for custody. The testimony revealed that J.S., Jr., and J.S., Sr., only became interested in obtaining custody of the children after they learned that the children could possibly be placed in the custody of S.C. and C.C. and that they showed little concern for the children during the one and one-half years before S.C. and C.C. filed their petition. Notably, J.S., Jr., and J.S., Sr., do not argue that it is in the children’s best interests to be placed with them for any reason other than their relation to the children by blood.
Section 12-15-1.1(1) sets forth a goal for the juvenile courts “[t]o preserve and strengthen the child’s family whenever possible,” but it does not mandate that the juvenile courts should overlook what is in a child’s best interests merely to preserve the family unit when doing so could prove to be detrimental to the child. J.S., Jr., and J.S., Sr., demonstrated a lack of concern for the welfare of the children until the threat of an award of custody to S.C. and C.C., and it is undisputed that the children have had virtually no relationship with J.S., Jr., and J.S., Sr.
A trial court’s judgment based on ore tenus evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court abused its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Ex parte Byars, 794 So.2d 345 (Ala.2001); Scholl v. Parsons, 655 So.2d 1060 (Ala.Civ.App.1995). This “presumption of correct *671 ness is based in part on the trial court’s unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor.” Littleton v. Littleton, 741 So.2d 1088, 1085 (Ala.Civ.App.1999). J.S., Jr., and J.S., Sr., have failed to demonstrate error on the part of the trial court in making those findings necessary to support its April 10, 2006, judgment based on the evidence presented at the final hearing. Accordingly, the judgment of the trial court is due to be affirmed.
2050576-AFFIRMED.
2050577-AFFIRMED.
CRAWLEY, P.J., and PITTMAN, J., concur.
MURDOCK, J., concurs in the result, with writing.
BRYAN, J., concurs in the result, without writing.

. Although separate case numbers were assigned to the proceedings involving each child, the court entered a single judgment disposing of these matters.